## Case No. 6,090.

### HARPER et al. v. NEW BRIG.

[Gilp. 536.] [1]

District Court, E. D. Pennsylvania. March 10, 1835.

MARITIME LIENS—REPAIRS AND MATERIALS—STATE LAW — SALE OF VESSEL UNDER PREFERRED CLAIMS—RIGHT OF LIEN CREDITOR TO SURPLUS —ASSIGNEE OF A VESSEL SUBJECT TO A LIEN.

1. A lien of workmen and materialmen on a vessel, in a port to which she belongs, depends entirely on the provisions of the state law by which it is given.

[Cited in Davis v. Child, Case No. 3,628; Macy v. De Wolf, Id. 8,933; The Alida, Id. 199; Ludington v. The Nucleus, Id. 8,598; The Celestine, Id. 2,541.]

2. The debts for which a lien on a vessel is given, are those contracted by the master and owner for work and materials used in building, repairing or furnishing her: the persons to whom such a lien is given, are the workmen and materialmen, who furnish the work and materials so used.

[Cited in The Alida, Case No. 199; The Velocity, Id. 16,911.]

3. Where work or materials, necessary for building, repairing or supplying a vessel, are furnished on a contract with an intermediate agent or person who is not the owner or master, neither the workmen and materialmen, nor such intermediate person or agent, have a lien on the vessel.

[Cited in Leland v. The Medora, Case No. 8,237; Carroll v. The Leathers, Id. 2,455.]

4. Where money, subject to distribution, is in court after the report of an auditor, the decree does not follow the report of the auditor as a matter of course, because no exception has been taken to it.

5. Where a surplus remains in court, after the sale of a vessel by a proceeding in rem in the admiralty, a party, having a lien or appropriation of the vessel precedently legally fixed, may claim a distribution of such surplus, although his original demand was not such as could be proceeded for in the admiralty.

[Cited in The Fanny, Case No. 4,637; The Panama, Id. 10,703; Remnants in Court, Id. 11,697; Leland v. The Medora, Id. 8,-

237; The Velocity, Id. 16,911; People's Ferry Co. v. Beers, 20 How. (61 U. S.) 402; The Hendrik Hudson, Case No. 6,358; The Edith, Id. 4,283.]

6. Where a vessel, bonâ fide assigned by the owner, is subsequently sold under a lien of workmen and materialmen, the assignee is entitled to a distribution of the surplus, in preference to a creditor having no such appropriation.

The New Brig having been condemned and sold by the decree of the court, made at August sessions, 1834 [Case No. 3,643], the money arising from the sale was brought into court for distribution. A great number of claims were filed, and among them one on the part of Charles A. Harper and William C. Bridges. All of them were referred to an auditor for liquidation. On his report being made to the court, Messrs. Harper and Bridges filed exceptions thereto.

HOPKINSON, District Judge. In August last a libel was filed in this court, by William S. Davis and George W. Lehman, against a certain vessel called the New Brig, praying for process of attachment against her, and that she might be condemned and sold for the payment of certain debts due to the libellants, and contracted with them by the owner of the brig, for materials furnished by them, and used by them, in building her. The process was accordingly ordered, the vessel was attached, and a final decree of condemnation made, after which the vessel was in due course sold, and the proceeds of the sale brought into court, where they now remain, subject to the order of the court for their distribution. A great number of persons who furnished work or materials for the brig, have presented their claims to the court, and prayed for payment out of the moneys which proceeded from her sale. Among them is the libel and claim of Charles A. Harper and William C. Bridges, who, with their petition, filed their account, consisting of several items, and amounting in the whole to the sum of six thousand and eighty-five dollars and seventy-eight cents. This claim, with all the others, was referred to an auditor to audit and examine all the accounts, and distribute the funds in court amongst the claimants. The auditor has performed this duty, and made a report of his proceedings to the court. No exception was taken to his report, but one on the part of Messrs. Davis and Lehman, which was dismissed; and another on the part of Messrs. Harper and Bridges, which is now to be decided. These libellants take exception to the report: (1) Because the auditor has reported, that a part of their account, or claim, was a lien on the vessel by virtue of the acts of assembly of this commonwealth of the 27th March, 1784 [2 Laws Pa. p. 95], of the 5th March, 1819 [7 Laws Pa. p. 161], and of the 11th April, 1825 [8 Laws Pa. p. 437]. (2) Because he has reported, that in the distribution of the funds arising from the sale of the brig, the claim

of Messrs. Harper and Bridges should be postponed to the claims of the other claimants enumerated. Some other exceptions are set out, but they depend upon the decision of the question mainly argued at the bar, that is, whether the account of Messrs. Harper and Bridges, or any part of it, gave them a lien on the brig, or a preference of payment out of the funds now in court, on the true construction of the acts of assembly above referred to. Some of the items of this account have not been insisted upon as liens, or debts, entitled to a preference; such as the account of J. Thomas for salt, twenty-three dollars and seventy-five cents; of G. Good, for scraping, twenty dollars; and of advances made by Messrs. Harper and Bridges to Jacob Tees, of cash, at sundry times, to build the brig, two thousand two hundred and forty-eight dollars and twenty-one cents. The other items of the claim consist of the accounts of several persons for work or materials furnished for the said brig, all of which were contracted for by Messrs. Harper and Bridges, and on their credit and responsibility, and the greater part of which has been actually paid by them. More than half of Collins' bill, of four hundred and fifty dollars, is paid, and the whole of that of Baldwin, for copper, amounting to fifteen hundred and eleven dollars and twenty-five cents. Soker's account for ship chandlery, of fourteen hundred and twenty-one dollars and forty-eight cents, is paid. Indeed, there remain unpaid of these accounts, only those of Hart and Flannegan, plumbers, for eighty dollars and sixty-two cents; and W. and S. Brown, riggers, for two hundred and two dollars and forty-four cents.

The claim of Messrs. Harper and Bridges, as they have put it forth in their libel, is as follows: They allege that, between the 22d February, 1834, and the 1st October, of the same year, at the request of Jacob Tees, who was building a new brig at the port of Philadelphia, they did provide, furnish and deliver to the use of the said brig, divers spars, blocks, copper, nails, ropes, rigging and other materials, necessary in the building and rigging of the said brig; and, also, at the request of the said Jacob Tees, did procure and cause divers work, labour and services to be done in and upon the building of said brig, by riggers, painters, plumbers and others, by them the libellants employed and paid for that purpose; and also that they did advance large sums of money to the said Jacob Tees, to be laid out by him, and which were so laid out, in and about the building and rigging of the said brig. The first claim, which charges that the libellants themselves furnished the materials enumerated, cannot be maintained, as they are clearly not of the description of persons mentioned in the acts of assembly, as entitled to the benefit given by them. The last mentioned claim, to wit, for moneys advanced by them, to Jacob Tees, to be laid out in building the brig, is not now

insisted upon as entitled to a lien and preference. Of course, the whole case turns on the second allegation, that is, that the libellants did procure and cause divers work, labour and services to be done in and upon the building of the said brig. So the case stood at the argument, since which, on the suggestion of the court, an amendment has been made to the libel, alleging, in substance, that the petitioners did procure and cause to be provided, furnished and delivered to the use of the said brig, and which were used and employed in and upon her, certain enumerated materials necessary for her building. In short, in respect to the materials which are now the subject of controversy, the petitioners allege (1) that they did, themselves, provide and furnish them to and for the brig; and (2) that they did procure and cause them to be provided and furnished by other persons, which persons were afterwards paid and satisfied therefor, by the petitioners.

The argument, on both sides, admits that the right of the petitioners must depend upon the provisions of the act of assembly of Pennsylvania, passed on the 27th March, 1784, and its supplements. The title of this act declares its object to be, "to secure the persons employed in the building and fitting ships and vessels for sea, by making the body, tackle, furniture and apparel of such ships and vessels, liable to pay the several tradesmen employed in building and fitting them, for their work and materials." The preamble of the act declares, that the business of ship building is an important branch of the commerce of the state; that the "tradesmen employed in this business are liable to losses by reason, that the persons employing them are frequently masters of ships, strangers and persons having no fixed property in the country," and that the ships or vessels are not liable to pay the amount of their bills, "whereby their labour and materials have been taken to satisfy other debts." To remedy this evil, it is enacted, that "ships and vessels of all kinds, built, repaired and fitted within this state, are hereby declared to be liable and chargeable for all debts contracted by the masters or owners thereof for or by reason of any work done or materials found or provided by any carpenter, blacksmith and others for, upon and concerning the building, repairing, fitting, furnishing and equipping such ship or vessel, in preference to any, and before any other debts, due and owing from the owners thereof." By the spirit as well as the language of this act, the debts to be preferred, are those which are contracted by the master or owner of a vessel, for work or materials found or provided, for the building of her, and the persons to be secured in the payment of said debts, are the mechanics and materialmen, by whom such work and materials are furnished and provided. These persons are to have a lien, a preference of payment, upon and out of their

own labour and materials, which shall not be taken from them to pay other debts. Neither the policy nor the enactments of the law go beyond this; and the law is satisfied when the debts, described as the objects of its protection, are paid and satisfied. The courts of Pennsylvania, not considering such preference to be entitled to judicial favour, have given a strict construction, to a similar enactment in favour of mechanics and others employed in building a house, in many cases; in that of Williams v. Tearney, 8 Serg. & R. 58, in that of Hinchman v. Lybrand, 14 Serg. & R. 33, and in that of Hills v. Elliott, 16 Serg. & R. 56. The parties to the contract protected by the provisions of the act, are declared to be the owner, or master of the vessel on the one side, and the person furnishing work or materials for her on the other. Indeed the latter are particularly described, as carpenter, blacksmith, mastmaker, sailmaker, shipchandler, and others; so that it would seem, that the mere fact of furnishing and providing materials for a vessel, will not give the lien, unless done by some of the persons mentioned and described in the act; and the supplements afterwards enacted, to extend the protection to venders of sail cloth and lumber merchants, confirm this construction of the law.

The counsel of the petitioners, not denying this construction, has endeavoured to show that the contracts in question, although not made directly by the mechanics and materialmen with the owner of the brig, were so made virtually, by a fair legal implication and intendment. With whom did Mr. Collins, Captain Baldwin or Mr. Ker, make their contracts for the materials furnished by them for this brig? Who was their debtor? On whose responsibility did they part with their property? Did they know Jacob Tees in the whole transaction? Did they make any contract, directly or indirectly with him expressly or by any legal implication? The whole testimony, to which I will generally refer, for there is no contrariety in it on this question, no ambiguity to be explained, shows directly and affirmatively the contrary. Tees was a man of no credit; a man they would trust for nothing; with whom they would have no such dealings, and would make no contracts. It is clear that these contracts were made, not with the owner of the vessel, but with Messrs. Harper and Bridges, on their personal credit and responsibility. The only contract with Tees, was made by the petitioners themselves, for their indemnity and security, but such a contract is also without the bounds of the act, because they do not fall within the description of persons or creditors to whom the lien and preference are given.

But it is contended by the petitioners, that in making these contracts, they acted as the agents of the owner, and that thus the contracts may be said to have been made, by the mechanics and materialmen and the owner, through the agency of the petitioners. The evidence does not sustain this view of the case; certainly the creditors did not consider that they were making contracts with the petitioners, as the agents of Tees, but for themselves and on their own account and responsibility. So they are charged in the bills. The petitioners never made any other suggestion, or pretended they were acting as the mere agents of another. This notion of agency is repudiated by all the cause. But, if it were so, how would it help the petitioners? Either as principals or agents, they have paid the bills; there is an end of the debt so far as the materialmen are concerned; and it is to them that the benefits of the law are given, and not to agents who make contracts, who take upon themselves and guarantee debts, and afterwards actually pay them. From that moment it is a contract between the agent and the principal, either made before the contracts were made for the materials, or raised by the law on his paying and advancing the money for the principal. In either case it is not a contract, or a debt within the provision of the acts in question. The agent makes his contract and arrangement with his principal, for his services, or for his advances, in his own way, for such reward, or such security as they may agree upon, and they look to each other, according to the terms of their contract, for a faithful performance of their respective stipulations. But with all this, the act to encourage ship building and give a preference to mechanics employed in building vessels, has nothing to do. It is a common debt, a common contract between the parties, and to be recovered in the common way. It is also obvious, that in order to support the claim on this ground and to consider it as a debt of the owner, contracted by his agent with the materialmen, it is necessary to drop Messrs. Harper and Bridges as the claimants, for, in their own right, for themselves, they cannot maintain it, and to put in their places, the persons that have been paid. How can this be done? They are answered at once; they are paid; they have no claim or debt, unsatisfied, either against Mr. Tees or his brig. They are no longer creditors, on this account, of the owner, or of the ship, or of Messrs. Harper and Bridges. Their debt is extinguished by the payment; it exists, for no purpose, against any body or thing. A new contract, a new debt, may have arisen by this payment between other parties; but the materialmen have no part or interest in it. But, may the petitioners use the names and rights of other persons to enforce or recover their debt from Mr. Tees? Can they take to themselves, for their own use, the security which the law gave to the materialmen and mechanics, and to them alone? On what ground do they claim this right or this equity? If as agents, paying money for their principal, then it was the payment of the principal, and there is an end of the debt and the security given by the

law for it, and of all the rights dependent upon a connection with the debt; if as sureties, paying the debt of their principal, it must be shown by some authority or established principle of law, that a surety, paying a debt in such circumstances, succeeds to, or may assume the privileges granted by the act of assembly to creditors and contracts of a different character and description. No debt is due to the surety until he pays the original debt, and then one arises, by implication of law, from his principal to him; but the same act, and the same moment that give birth to this new debt, are the death of that which is the object of legislative favour. They do not and cannot exist together. The surety has no debt until he has cancelled, annihilated the claim of the mechanic, nor can the security given for the payment of that debt, secure it. The letter of the law, the policy of the law is satisfied, when those persons for whose benefit they were enacted, are paid, and their contracts fulfilled. It never intended to carry on this preference, to continue this lien, through all the channels of equity that may spring from the original transaction. But if we were to admit that this right of preference, this privilege, is such a one as may be adopted, transmitted by an equitable implication, assumed at will; if it may be separated from the debt it was given and intended to secure, and be attached to another debt, another contract of a different character, with a different consideration, and between other parties, still it is a necessary preliminary, that the right should have existed in the persons from whom it is pretended to be derived. Here, then, we must return to the original debts and the original creditors, on whose rights the petitioners found their present claim, and we shall find that they were not contracted with the owner of the vessel, nor on his credit, nor the credit of the brig, but on a contract with the petitioners personally, and on their credit and responsibility, which, therefore, is not such a contract, nor such a debt, as falls within the provisions of the act of assembly. The persons, then, who furnished the articles in question, sold them to Messrs. Harper and Bridges, by whom they were delivered to Mr. Tees for the use of his brig. On such a sale no lien attached to the brig; no right of preference was vested in them; and, of course, none could be transmitted to the petitioners by implication of law or otherwise.

Under these different views of the case, in no aspect in which it presents itself, can I discover any principle which will authorise me to comply with the prayer of the petitioners, and award to them a preference of payment, out of the funds now in court, arising from the sale of the brig, to indemnify them for the moneys they have actually paid for materials employed in building her. As to the small accounts, or sums, that remain unpaid, but for which they are responsible, they have not even the equity which attaches to the other cases; in fact, they have no debt, no claim, until they do pay. The remaining part of the petition which prays for the remnant, or surplus of the funds in court, after paying and satisfying the preferred debts, as reported by the auditor, will be the subject of the future consideration and order of the court.

The exceptions were overruled, and the report confirmed.

The libel and petition of Messrs. Harper and Bridges, besides the prayer and claim disposed of in the opinion given by the court on the exception to the report of the auditor, contained a prayer that the surplus remaining in court, after satisfaction of the preferred claims, should be adjudged to be paid to them.

HOPKINSON, District Judge (March 20, 1835). The libel and petition of Charles A. Harper and William C. Bridges, trading under the firm of Charles A. Harper & Co. prays, in the first place, that their claim and debt may be paid out of the moneys in court, proceeding from the sale of the New Brig, as a preferred debt, in common with the other debts entitled to a preference under the provisions of the act of assembly of 27th March, 1784; and, in the second place, if that should be denied, that the surplus of said proceeds, remaining after the satisfaction of the claims adjudged to be paid, shall be paid to them. The first prayer of this petition has been denied by the court, and the other is now to be considered and decided. This claim on the surplus or remnant of the proceeds of the sale of the brig, was presented to the auditor, and by him allowed and reported accordingly. It has been argued, that no exception having been made to this report, it is final, and, of itself, entitles the petitioners to the money. I cannot assent to this doctrine. The money in court is sufficient, as it always must be where there is a surplus, to pay all the petitioners, whose claims have been allowed, their respective debts. They are all satisfied, and have neither any interest nor right to interpose in the disposition of the remainder of the fund. There is, therefore, no party in court to take exception to the report of the auditor for the distribution of the surplus; but it is, nevertheless, the duty of the court to look carefully to the disposal of it. It cannot go out of the custody of the court, but by the action and order of the court, and no such order will be made, until the court is well satisfied that the party asking for it is legally entitled to it. It is not a derelict to be picked up by the first person who may lay his hand upon it; it has a legal owner somewhere, and to him only should it be transferred. The decree of the court, in such a case, will by no means follow the report of the auditor as a thing of course, because no exception has been taken to it; but must be made on the judgment

and responsibility of the court, there being no parties whose consent will cure an error.

The power of a court of admiralty over these remnants or surpluses is not an arbitrary power, but is governed by principles, which the court is bound to observe before it acts, whether there be or be not a party in court, having an interest or disposition to obtain a proper distribution of them. We have but few reported adjudications on this subject, but there is enough to put us on the ground, on which such claims should stand. I will advert to them, somewhat at large, because, this being the first case of this description that has called for my decision, I wish to have my views of it fully understood. In the case of The John, 3 C. Rob. Adm. 288, the facts were these. The ship was an American vessel, sold under a decree of the court for wages, which being paid, a surplus remained of about seven hundred pounds. A motion was made to arrest this money on behalf of Messrs. Wright & Co. who had supplied arms and stores to the ship, on a voyage from London to Venice. It was urged, for the claim, that, as it was a foreign ship, the party could have no other remedy. The application was supported by an affidavit of one of the claimants, which exhibited these facts: that, in the year 1798, the American ship John, R. Jackson, master, being in the river Thames, was chartered, on a voyage from London to Venice, with a cargo or freight; that American ships being then exposed to capture by the Algerines and the French, it became expedient that she should be armed for her defence, and have on board additional stores; that the master of the ship applied to the deponent's house to be furnished, with such arms and stores as he stood in need of, and they accordingly furnished them; that, without these supplies the ship could not go on her voyage with safety, and without paying a heavy premium of insurance; that the supply of arms and stores was so furnished on the credit of her voyage, and on the assurance of the solvency of her owner, John Donaldson, of Philadelphia. The ship went on her voyage, and returned to London in 1799, when, on the application of the master, a further supply of stores was furnished. Repeated applications had been made to the agent or broker of the ship, as well as to the master, for payment, but no part could be obtained. When the ship was sold, a principal part of the arms and stores, furnished as aforesaid, remained on board and were also sold, and the proceeds thereof brought into court. The owner, John Donaldson, became insolvent; the master, Jackson, died in America; and the petitioners had no prospect of obtaining payment, unless the court would enable them to recover it out of the balance of the proceeds, arising from the sale of the ship, remaining in court. On these facts, the court thought there was a distinction in the case of foreign ships against which the party could have no other remedy; but there being an attachment of the proceeds on the part of another creditor, and, of course, a conflicting claim, the money was not to be paid to the petitioners until it was removed. Afterwards, this being done, the court said, that the cases had been looked up, and that it had continued to be the practice of the court to allow materialmen to sue against remaining proceeds in the registry; and the payment was decreed. The decree, it will be observed, was for supplies of arms and stores, necessary for the safety of the ship, furnished by the petitioners, directly to her, in a foreign port, at the request of the master, on the credit of her voyage; and the court seems to have considered the petitioners to be, in fact, materialmen furnishing the articles in question directly to the ship. Certainly it was a case in which the master had the right to hypothecate the vessel, and, in a future case, we shall see the importance of this circumstance. This case of The John will further show, that a like decree was refused for a creditor, whose account was of a general and unsettled nature. It was as follows. In September, 1798, the ship arrived at London, from Philadelphia, with a cargo; and, by the master, Jackson, was put into the hands of the appearer, to collect the freights and do the necessary ship's business, as agent. She was chartered for Venice, and the outfit and insurance for that voyage, were paid by him, and he also, by the order of Jackson, insured the ship from Venice to London, and on her arrival made various disbursements and advances for her, which, with some other charges included in his account, made a final balance due to him of two hundred and ninety-six pounds, five shillings and ten pence. He further states, that the owner of the ship was bankrupt, and the master dead in America, and that he has no chance of recovering the balance due to him, but from the proceeds of the ship remaining in court; that he had paid all the tradesmens' bills and demands against the ship, with some exceptions, for which he did not consider himself responsible, they being employed by said Jackson himself. The court rejected the petition, observing that the account was of too general and unsettled a nature to entitle the party to this remedy.

I find a case decided in this court, with much consideration, which confirms the doctrines of that just cited, and explains more fully the principles of the decision. I refer to that of Gardner v. The New Jersey [Case No. 5,233]. It was a suit for mariner's wages, in which a decree of condemnation was passed and the ship sold. There remained a surplus or remnant, after the payment of all the sums adjudged to be paid, with the costs and charges. The petition of the master was presented, stating, that he had expended, during the voyage, for pilot-

age and mariners' wages, and other charges necessary for the ship's use, two hundred and fifty-seven dollars which remained unpaid; and that there was due to him for wages as master, eight hundred and twenty-seven dollars. Another petition was also presented by W. Baldwin, stating that he was employed as physician in and for the ship, on her voyage, and that there was due to him for his services one hundred and sixty-seven dollars. The petitioners respectively prayed, that the sums due to them should be paid out of the surplus moneys remaining in court, after the payment of the sums decreed. The judge says, "When I first came into this court, I made, in several instances, distribution of surplus money, under the idea that I had power so to do, agreeably to the doctrine now stated (in the argument) to justify me in granting the prayers of the petitions: but, on experience, I found myself involved in many difficulties, in the application of this doctrine." He declares that he found it necessary to fix some general rules for his government in the distribution of surplus moneys, and determined "that it shall appear, that a sum claimed out of the surplus or remnant is, either of itself, or in its origin, a lien on the ship, or other thing out of which the moneys were produced." This rule, he says, is justified by the practice of the civil law, of the English chancery, and of the courts of common law. Proceeding on this principle he allowed the claim of the master for the sums paid by him abroad to the mariners, as well as for moneys advanced by him in foreign ports, which he considered to be liens for which the ship was hypothecated. Supplies afforded by materialmen and pilotage, are suable in the admiralty, and "if the master pays demands for those claims, he represents the claimants, and the lien continues on the moneys produced by the sale of the ship." I am not prepared to adopt the suggestion that the lien continued, either upon the ship or her proceeds, after the debt was discharged for the payment of which it was given; but it is enough for the principle, that the debt, in its origin, was a lien on the ship: it was for necessaries furnished in a foreign port, for which the ship was liable, and for which the master had power to hypothecate her. The judge observes, that for materialmen and domestic pilotage, and the sums due on their account, he has generally referred the parties to the state jurisdiction, wishing to avoid collisions, "but for those furnished or paid in foreign ports, or here on ships on their voyage, and not at the port of outfit, the owners being resident here, I have reimbursed or distributed out of surplus moneys, where liens or hypothecations have appeared to me to have attached." On the same principle, wharfage has been allowed out of proceeds, as the wharfinger might detain the ship until payment. While therefore, the judge allowed the claim of the master to be paid, out of the surplus, for his

advances made for the ship abroad, he refused his claim for wages, on the ground that "his contract was clearly personal, and made with and on the credit of the owners resident here, and not on that of the ship." In concluding his opinion he adds, "I deem it an exclusion from a distribution, or a claim to the surplus, unless a lien or appropriation is precedently and legally fixed, that those who claim such distribution could not sue in the admiralty for their demands." If, therefore, a lien or appropriation of the thing, or money proceeding from it, is legally fixed, the party may claim the distribution, although the original demand was not such as could be sued for in the admiralty.

Adopting the rules or principles so well explained in the cases I have referred to, we must apply them to the case now under consideration. The claim of the petitioners to the surplus in question may be considered as resting on two grounds, either of which, if maintained, will entitle them to it: (1) The original debt. (2) The bill of sale made and executed by Jacob Tees, the owner of the brig, dated on the 23d November, 1833, by which she was sold and transferred to the petitioners.

1. As to the original debt. It began with a personal contract or arrangement made between Tees and the petitioners, by which they were to procure and furnish materials, and advance money for the building and equipping of the brig, the details of which contract are set out in the deposition of Tees. It was altogether a personal agreement between the parties, giving no lien upon the vessel, and clearly not suable in the admiralty. In the performance of this agreement, the petitioners contracted for and purchased from various persons, certain materials to be used in the construction of the brig, but which were sold and delivered solely on the credit and responsibility of the petitioners, without any reference to or dependence upon the owner, or the brig, for payment. The whole transaction took place here, in the port where the vessel was built and the owner resided. The sale and delivery of the materials in question were, in truth, made to the petitioners and not to Tees; who, however, afterwards received them from the petitioners on such terms, for security and reimbursement, as they had previously agreed upon. It was an affair between themselves, in which the persons who furnished the materials had no part or concern. This case, then, differs in its essential features from that of The John. That was a foreign ship, whose owner was in a distant country, with whom no contract was made, and to whom no credit was given. The advances were made altogether on the credit of the ship and her earnings, and, if she was not made liable for repayment, the creditors had no remedy for the recovery of their demands. The arms and stores, in that case, were furnished by the petitioners directly to the ship, and the court consid-

ered them as materialmen, and not as merchants purchasing the articles from materialmen on their credit, for, in the final decree, the court, as the reason for it, says, "It has been the practice of the court to allow materialmen to sue against proceeds in the registry." Nor will the claim of the petitioners, on the ground of the original debt, stand better on the principles adopted by Judge Peters in the case of Gardner v. The New Jersey [supra]. The debt due by the owner of the brig to Harper and Bridges never was suable in the admiralty, never was a lien on the vessel, nor can be so on the proceeds of her sale. The law never appropriated the brig or her proceeds for the payment of their debt. It was the common case of money paid and advanced, and goods sold and delivered, by one man for the use of another, on a personal contract and responsibility to be sued for and recovered in a court of common law.

The remaining title, which the petitioners set up to sustain their claim to the money in court, is the bill of sale made by Jacob Tees to them on the 23d November, 1833, which, for a consideration of three hundred dollars, grants, sells and transfers to them "the hull of a new brig, now building by said Tees at his ship-yard;" and Tees further engages to finish her. Jacob Tees, in his deposition, says that he gave Harper & Co. that bill of sale as a security for payment of the money the firm advanced, and that he was to pay them two and a half per cent. besides the interest, or to take their notes at four months, without interest until due. The bill of sale on its face assigns and transfers absolutely to the petitioners all the right, title and interest of Tees in and to the brig, or, as explained by his affidavit, gives them a lien or mortgage upon her for the payment of the advances in money and materials made by them for her building. If, then, on the supposition of an absolute sale, the petitioners are considered as standing in the place of Tees, with all his rights, they would be entitled to the surplus money which remains after satisfying all the claims upon the vessel and her proceeds; especially in the absence of any conflicting claim or right to it. But the right of the petitioners stands equally strong on the other ground or supposition. The brig has been fairly and bona fide assigned or pledged to them for the payment of moneys advanced by them, in good faith, to the owner, and actually expended and applied in building her. They have therefore obtained a preference of any general creditor of Tees, even if such a one could come into this court for these funds. They show a "lien or appropriation" of the vessel, which was "legally fixed," and which gives them a precedence over any creditor having no such security or appropriation of this property for the payment of his debt; and the appropriation follows the proceeds or the sale of the brig pledged and appropriated.

Decree. It is ordered, adjudged and decreed, that the surplus and remnant of the proceeds of the sale of the new brig, after payment of all sums adjudged to be paid, and costs and charges, amounting, as appears by the auditor's reports, confirmed by the court, to the sum of thirteen hundred and nineteen dollars and sixty-six cents, be paid by the clerk of the court to the petitioners, Charles A. Harper and William C. Bridges, trading under the firm of Charles A. Harper & Co.